**In re MICRON TECHNOLOGIES, INC. SECURITIES LITIGATION.**

No. CV-06-85-S-BLW.

United States District Court, D. Idaho.

Dec. 19, 2007.

**630**

Bruce S. Bistline, Gordon Law Offices, Boise, ID, David A. Rosenfeld, Lerach Coughlin Stoia & Robbins, Melville, NY, John K. Grant, Mary Blasy, John K. Grant, Coughlin Stoia Geller Rudman & Robbins LLP, San Francisco, CA, Philip Howard Gordon, Gordon Law Offices, Boise, ID, Sam Johnson, Johnson & Monteleone, Boise, ID, Reed Garrett Smith, WM Breck Seiniger, Seiniger Law Offices, P.A., Boise, ID, M. Patrick Duffin, M. Patrick Duffin, PA, Idaho Falls, ID, Seth Klein, Schatz Novel Izard, PC, Hartford, CT, Terry M. Michaelson, Hamilton Michaelson & Hilty, Nampa, ID, for Plaintiffs.

Barry M. Kaplan, Douglas W. Greene, Wilson, Sonsini, Goodrich & Rosati, Seattle, WA, Nina F. Locker, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, CA, Richard H. Greener, Greener Burke Shoemaker P.A., Wade L. Woodard, Banducci Woodard Schwartzman PLLC, Boise, ID, for Defendants.

## MEMORANDUM DECISION AND ORDER

B. LYNN WINMILL, Chief Judge.

### INTRODUCTION

The Court has before it a motion for class certification filed by plaintiffs. The Court held oral argument on December 10, 2007, and took the motion under advisement. For the reasons expressed below, the Court will grant the motion.

### FACTUAL BACKGROUND

This § 10(b) class action was filed by Micron shareholders allegedly injured by Micron's participation in an illegal price-fixing conspiracy. Micron produces Dynamic Random Access Memory (DRAM) chips for use primarily in computers. Because DRAM was Micron's principal product during the times at issue, Micron's stock price tracked closely with the price of DRAM.

Plaintiffs allege that Micron entered into a global price-fixing conspiracy in 1999 to ensure high DRAM prices. Plaintiffs claim that Micron's price-fixing scheme was also designed to inflate their stock price, since DRAM prices so closely tracked the stock price.

The scheme worked, plaintiffs allege, because even though computer demand was down, DRAM prices rose rapidly. At the same time, Micron's Vice–President of Worldwide Marketing, Michael Sadler, and other Micron officials, issued public statements attributing high DRAM prices to market forces.

Plaintiffs allege that these statements were false because Micron officials knew it was illegal price-fixing, not market factors, that led to increasing DRAM prices. Plaintiffs allege that Micron's deception had the desired effect: Micron's stock price increased.

On June 17, 2002, the U.S. Department of Justice (DOJ) issued a federal grand jury subpoena to Micron, seeking documents relating to communications between DRAM manufacturers regarding the pricing and sales of DRAM chips. DOJ also issued subpoenas to the other two largest global manufacturers of DRAM, Samsung and Infineon Technologies.

A DOJ spokeswoman refused to provide any details beyond the fact that the DOJ was investigating the computer memory chip industry. Press accounts included a quote from a "federal official, speaking on condition of anonymity," who "confirmed that the subpoenas were part of an ongoing criminal investigation." *See Exhibit 14* at p. 2. Micron publicly disclosed the service of the subpoena, and announced that it would cooperate with the DOJ, although it denied that it violated antitrust laws. *See Exhibit 13.*

On June 21, 2002, the Wall Street Journal reported these events, noting that the investigation "follows a sharp but brief price increase for [DRAM] earlier [in 2002]." *See Exhibit 19.* While prior investigations focused on dumping by foreign chip makers, recent exits by some companies reduced competition, "thereby concentrating greater pricing power in the hands of a few large suppliers." *Id.* The Journal quoted earlier statements by Dell Computer's CEO, Michael Dell, expressing alarm at the "cartel-like behavior of a couple of DRAM suppliers." *Id.* Dell had concluded that the collusion was "successful for a very short period of time." *Id.* The article then noted that DRAM prices "shot up to $4.50 each in [the first quarter of 2002] from an average of $1.97 each in the fourth quarter of last year." *Id.* Others were not convinced that collusion was behind price movements, and they cited the inherent volatility of the DRAM market as the cause of price swings. *Id.*

Within the next three months, sixteen antitrust actions were filed against Micron and other producers. These suits were filed by DRAM purchasers who claimed they were victims of the high prices caused by the price-fixing. The complaints allege that in the fall of 2001, Micron and the other defendants entered into a secret agreement to reduce supply by 20%, which resulted in price hikes. *See Exhibit 40.* However, the complaints cite no evidence in support of these allegations.

By October 30, 2002, there were twenty-three such suits. While Micron's stock price was $48.83 per share in March of 2001, it had dropped to $6.76 by the close of the proposed class period, February 13, 2003.

On December 17, 2003, the DOJ issued a press release revealing the details behind an obstruction of justice charge filed against a Micron manager. The manager, Alfred Censullo, altered his notes of conferences with other Micron managers concerning, among other things, "prices at which competing DRAM suppliers would sell their products to major [computer makers] in upcoming price negotiations." *Id.* He also concealed 14 pages "from his notebooks that contained competitor pricing information and obvious alterations...." *Id.* His purpose was "to disguise the nature, source, and accuracy of information ... concerning contacts and communications between DRAM suppliers relating to the pricing and sale of DRAM." *Id.*

On November 11, 2004, Micron's CEO Steve Appleton publicly admitted for the first time that the DOJ investigation revealed evidence of DRAM price-fixing by Micron employees and its competitors. Micron signed an agreement with DOJ whereby Micron would participate in the DOJ's Corporate Leniency Policy, which provides that in exchange for Micron's full cooperation, it would not be subject to any prosecution or penalty.

### 3. *Class Certification Motion*

Plaintiffs have brought this § 10(b)/Rule 10b–5 action to recover damages for those Micron shareholders who bought their stock at prices allegedly artificially inflated by the price-fixing. More specifically, plaintiffs propose a class defined as follows: All persons who purchased Micron's publicly-traded securities on the open market between February 24, 2001, and February 13, 2003, excluding defendants, directors and officers of Micron, and Micron employees who participated in or had knowledge of the DRAM price-fixing conspiracy, their families and affiliates.

## ANALYSIS

### 1. *Overview*

The plaintiffs have the burden of establishing whether the proposed class satisfies the four requirements of Rule 23(a): (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. The district court must also find that at least one of the factors listed in Rule 23(b) is present. The plaintiffs are proceeding under Rule 23(b)(3), and thus must show that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### 2. *Numerosity*

The prerequisite of numerosity is satisfied if "the class is so large that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). There is no dispute here that this requirement is met.

### 3. *Commonality*

■ A class has sufficient commonality if "there are questions of fact and law common to the class." Fed.R.Civ.P. 23(a)(2). The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3). *Hanlon*, 150 F.3d at 1019. Indeed, Rule 23(a)(2) has been construed "permissively." *Id.* All questions of fact and law need not be common to satisfy the rule: "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* Here, plaintiffs' complaint alleges a single fraudulent scheme—price fixing—that affected each member of the class by artificially inflating the price they paid for Micron stock. This establishes commonality under the permissive standard of Rule 23(a)(2).

### 4. *Typicality*

■ The typicality prerequisite of Rule 23(a) is fulfilled if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ.P. 23(a)(3). Here, the lead plaintiffs—the Unions—have the same claims as all class members; all of them claim to be the victims of artificially high Micron stock prices caused by price-fixing. Thus, the "typicality" requirement is met.

### 5. *Adequacy of Representation*

■ The fourth requirement of Rule 23(a) is that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). To satisfy constitutional due process concerns, absent class members must be afforded adequate representation before entry of a judgment which binds them. *Hanlon*, 150 F.3d at 1020. Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class? *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978).

Micron has not raised any conflicts of interest, and does not assert that counsel for the named plaintiffs will not vigorously prosecute the case. In fact, plaintiffs' counsel has vigorously prosecuted other class actions in this Court. Micron does argue, however, that the Union representatives showed at their depositions that they knew little about the litigation and did not intend to attend the trial. In other deposition excerpts, however, the representatives showed that they did have an understanding of this litigation and were receiving regular updates concerning its progress. This is sufficient to establish the adequacy of representation requirement. *See In re Cavanaugh*, 306 F.3d 726, 737 (9th Cir.2002) (holding that Rule 23 in PSLRA cases does not mandate that lead plaintiffs have "at-the-ready the details of each case in which they are involved. . . .")

### 6. *Common Questions Predominate*

■ In addition to meeting the conditions imposed by Rule 23(a), the parties seeking class certification must also show that the action is maintainable under Fed.R.Civ.P. 23(b)(1), (2) or (3). *Hanlon*, 150 F.3d at 1022. In this case, the plaintiffs seek certification pursuant to Rule 23(b)(3), which re-

quires that common questions must "predominate over any questions affecting only individual members," and that the class resolution must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

■■■ "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 608, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). This analysis presumes the existence of common issues of fact or law; thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). *Hanlon,* 150 F.3d at 1022. In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues. *Id.*

Micron claims that individual issues of reliance will predominate over common issues. Micron recognizes that plaintiffs are pursuing a fraud-on-the-market claim that presumes reliance, *see Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988), but argues that the theory does not apply here. Without the benefit of this theory, each plaintiff would have to show reliance, which "effectively would ... prevent[ ] [plaintiffs] from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *Id.* at 241, 108 S.Ct. 978.

Plaintiffs respond that Micron is inviting the Court to examine the merits, an inquiry that is expressly forbidden by a well-established line of cases. *See e.g., Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (stating that "[w]e find nothing in either the language or history of Rule 23 that gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action").

■■■ Plaintiffs are correct to a point. Since *Eisen,* the lower courts have refined the scope of review. A district court "should not assess any aspect of the merits unrelated to a Rule 23 requirement." *In re Initial Pub. Offering Sec. Litig.,* 471 F.3d 24, 41 (2d Cir.2006). However, this Court "*must* consider evidence which goes to the require-ments of Rule 23 at the class certification stage even if the evidence may also relate to the underlying merits of the case." *Dukes v. Wal-Mart,* 509 F.3d 1168, 1178, n. 2 (9th Cir.2007). The Court's analysis of each Rule 23 element must be "rigorous," and a refusal to conduct that examination because it overlaps with the merits "would [be] error." *Id.*

Applying that standard here, the Court must conduct a rigorous examination into whether common issues will predominate. Because individual reliance issues will predominate unless plaintiffs may rely on a legal presumption of reliance, the Court must conduct a rigorous examination into whether plaintiffs are entitled to use the fraud-on-the-market doctrine in this case.

■■■ Reliance is one element of plaintiffs' Rule 10b–5 cause of action. *Basic,* 485 U.S. at 243, 108 S.Ct. 978. Reliance may be presumed if the fraud-on-the-market doctrine applies. *Id.* This doctrine is "based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business...." *Basic,* 485 U.S. at 241–42, 108 S.Ct. 978. Misleading statements will therefore defraud purchasers of stock "even if the purchasers do not directly rely on the misstatements." *Id.* Thus, the presumption of reliance is available only when "a plaintiff alleges that a defendant made material representations or omissions concerning a security that is actively traded in an efficient market...." *Binder v. Gillespie,* 184 F.3d 1059, 1064 (9th Cir.1999).

Plaintiffs have provided proof that Micron shares were traded in an efficient market. *See Declaration of Grant.* Micron agrees, but argues that plaintiffs have failed to show loss causation—that is, that the omissions caused Micron shareholders to suffer a loss.

Micron is correct that plaintiffs must show, as one element of their case, that the omissions caused Micron shareholders to suffer a loss. *See Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). However, *Dura* does not list loss causation as a necessary predicate to application of the fraud-on-the-market doctrine. Instead, *Dura* lists reliance and

loss causation as separate elements, subject to separate proof. *Id.* at 341, 125 S.Ct. 1627.

Loss causation, then, is an issue related to the merits rather than to the Rule 23 inquiry into whether common issues will predominate. Accordingly, the Court's rigorous analysis cannot extend to the loss causation issue at this stage of the proceedings.

Micron cites *Oscar Private Equity Investments v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir.2007) for its holding that at the class certification stage, plaintiffs must prove that "it is more probable than not" that the corrective disclosure—the revealing of the secret—made a "significant contribution to a price decline." In other words, in the Fifth Circuit, plaintiffs must prove loss causation to be entitled to a class certification.

*Oscar* has not been considered or adopted by the Ninth Circuit. It is unlikely that it would be adopted in this Circuit because it misreads *Basic.*

The *Oscar* decision relies on *Basic's* holding that the presumption of reliance may be rebutted by "[a]ny showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff." *Basic*, 485 U.S. at 245, 108 S.Ct. 978. This includes a showing "that the market price would not have been affected by the alleged misrepresentations." *Id.* at 248, 108 S.Ct. 978.

From this, *Oscar* concludes that in a class certification proceeding, defendants can challenge the application of the fraud-on-the-market doctrine by showing that the market price was not affected by the misrepresentations. In other words, *Oscar* reads *Basic* to require a rigorous examination of loss causation at the class certification stage.

This reading of *Basic* ignores a crucial footnote. In the midst of its discussion of the defendant's burden on rebuttal to show that the market price was not affected by the misrepresentation, the *Basic* decision drops a footnote stating that "[p]roof of this sort is a matter for trial, throughout which the District Court retains the authority to amend the certification order as may be appropriate." *Id.* at 249, n. 29, 108 S.Ct. 978. Accordingly, the opinion continues, "we see no need to engage in the kind of factual analysis the dissent suggests that manifests the oddi-

ties of applying a rebuttable presumption of reliance in this case." *Id.*

An accurate reading of *Basic* places a requirement on plaintiffs, at the class certification stage, to show that the market was efficient. The plaintiffs' proffer of evidence concerning efficiency must be rigorously examined by the Court before finding that they are entitled to a presumption of reliance. While defendants are entitled to rebut that presumption, that issue is appropriate for resolution only after discovery.

■■■ Even if Micron's rebuttal evidence is considered, it would not satisfy their burden. Micron must make "any showing that severs the link" between the misrepresentation and the stock price. *Basic*, 485 U.S. at 248, 108 S.Ct. 978. Micron focuses on the word "any" as implying a permissive standard, allowing them to simply raise questions about the link to satisfy their rebuttal burden. That interpretation ignores the word "severs." Micron must do more than just raise questions—it must "sever" the link. The discussion following the use of this word in *Basic* illustrates that point by describing what defendants "could show" that would sever the link. *Id.*

Micron's evidence here does not show that the link is severed. For example, Micron filed the affidavit of its expert, Denise Neumann Martin, who concludes that "51% of the variation in Micron's stock price can be explained by the variation in the AMEX Semiconductor HOLDRS Index." *See Martin Affidavit* at p. 4. The AMEX Index is comprised of companies involved in the same semiconductor business as Micron but not subject to any DOJ investigation. Martin's point is that Micron's stock price mirrored that of its competitors who were not engaged in price-fixing, and hence the price-fixing must have had no effect on the stock price.

Yet, by her own analysis, 49% of the variation in Micron's stock price cannot be explained by the variation in the index. Could it be explained by price-fixing? Whatever the answer, Martin's analysis does not—as a matter of law—sever the link between omissions and price.

■■■ Martin also asserts that at the same time the price-fixing was being revealed,

there was also "negative earnings news from major technology firms and troubling geopolitical news developments" that would have acted to drive down Micron's stock price. *Id.* at p. 7. Neumann argues that "[d]etermining what caused the decline in Micron's stock price following the mix of information released on June 18 and June 19, 2002, requires that a complete set of these attributes be identified and their impacts measured. Plaintiffs have not offered any such analysis." *Id.* at p. 8.

But it is Micron that carries the burden here, not plaintiffs. The plaintiffs carried their initial burden by demonstrating the efficiency of the market; the burden of rebuttal is Micron's. Martin's analysis relies heavily on the lack of evidence from plaintiffs, misconstruing the burden and failing to satisfy Micron's burden of severing the link.

For all of these reasons, the Court rejects Micron's argument that plaintiffs cannot rely on the fraud-on-the-market doctrine.[1] Of course, Micron remains free to rebut the doctrine after discovery—and to seek decertification at that time. However, the Court finds, after its rigorous examination of the existing record, that individual reliance issues will not defeat the requirement that common issues predominate.

■■■■■ Finally, the Court finds that a class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). This determination "necessarily involves [comparing a class resolution with] alternative mechanisms of dispute resolution" such as "individual claims." *Hanlon,* 150 F.3d at 1023. If this action was not certified as a class, each plaintiff would have to establish the same fraudulent scheme. This repetitive process would "unnecessarily burden the judiciary." *Id.* Furthermore, "it would be folly to force each to prove the nucleus of the alleged fraud again and again." *In re American Continental Corp./Lincoln Savings & Loan Securities Litig.,* 140 F.R.D. 425, 431 (D.Ariz.1992). Many individual investors would not have the resources to pursue litigation. For these reasons, a class resolution is superior to the alternatives under Rule 23(b)(3).

■■■■ The Court therefore finds that the proposed class meets the requirements of both subsections (a) and (b)(3) of Rule 23. Micron contends, however, that the beginning date for the class period must be the day after the first actionable statement was made by Micron. Micron alleges that date is December 19, 2001, the day after defendant Sadler made a public comment that strong demand resulted in stock price increases.

■■■■ However, a material misrepresentation under § 10(b) and Rule 10b–5 can include an "omitted fact" if "there is a substantial likelihood that a reasonable shareholder would consider it important [in his investment decision]." *Basic,* 485 U.S. at 231, 108 S.Ct. 978. Here, plaintiffs have presented proof (in the form of plea agreements of conspirators in the price-fixing scheme) indicating that price fixing began as early as 1999. Micron kept that information secret. "[T]he hiding and secreting of important information obstructs the operation of the markets as indices of real value." *Id.* at 246, 108 S.Ct. 978.

■■■■ Given this showing, the Court will not adopt Micron's argument that the starting date should be later. Micron argues next that the class period must end on the date the truth about the price-fixing was revealed, because further reliance by stock purchasers would be unreasonable. Micron picks June 18, 2002, as the ending date, because that was the date Micron received a subpoena from the Department of Justice (DOJ) in its price fixing inquiry.

Once again, however, this issue is fact intensive. The DOJ did not immediately reveal that it was investigating price-fixing, but merely that it was conducting a criminal investigation. While in the coming weeks there was speculation among analysts that the investigation was focusing on price-fixing,

---

1. Micron urges the Court to adopt the reasoning of *Oran v. Stafford,* 226 F.3d 275 (3rd Cir.2000). However, *Oran's* bright-line rule requiring an immediate market reaction was expressly rejected by this Circuit in *No. 84 Employer–Teamster*

*Joint Council Pension Trust Fund v. America West Holding Corp.,* 320 F.3d 920, 934–35 (9th Cir. 2003). That decision adopted the "fact-specific inquiry" set forth in *Basic. Id.* at 934. The Court therefore declines to adopt *Oran.*

most of those same analysts believed the investigation would uncover nothing. It took a few months for the first wave of anti-trust law suits to be filed against Micron.

While June 18, 2002, is therefore too soon to end the class period, it was clear beyond doubt that by September 18, 2002, there was not only wide-spread knowledge that the investigation related to price-fixing, but also many anti-trust suits filed against Micron. Yet plaintiffs have the class period continuing for another five months beyond that date. Upon a rigorous examination, the end date selected by plaintiffs does not hold up, and the Court will move up the end date to September 18, 2002.

### 7. Conclusion

For the reasons set forth above, the Court shall grant plaintiffs' motion to certify. The Court will certify a class defined as follows: All persons who purchased Micron's publicly-traded securities on the open market between February 24, 2001, and September 18, 2002, excluding defendants, directors and officers of Micron, and Micron employees who participated in or had knowledge of the DRAM price-fixing conspiracy, their families and affiliates.

The Court will also appoint as lead plaintiffs, the International Union of Operating Engineers, Local 132 Pension Fund and the Chemical Valley Pension Fund of West Virginia. The Court will also appoint class counsel and liaison counsel as requested.

### ORDER

In accordance with the Memorandum Decision set forth above,

NOW THEREFORE IT IS HEREBY ORDERED, that the motion for class certification (Docket No. 102) is GRANTED.

IT IS FURTHER ORDERED, that the following class of plaintiffs is hereby certified pursuant to Rule 23(b)(3): All persons who purchased Micron's publicly-traded securities on the open market between February 24, 2001, and September 18, 2002, excluding defendants, directors and officers of Micron, and Micron employees who participated in or had knowledge of the DRAM price-fixing conspiracy, their families and affiliates.

IT IS FURTHER ORDERED, that co-lead plaintiffs, the International Union of Operating Engineers, Local 132 Pension Fund and the Chemical Valley Pension Fund of West Virginia, are hereby appointed as class representatives pursuant to Rule 23.

IT IS FURTHER ORDERED, that the law firms of Coughlin Stoia Geller Rudman & Robbins LLP be appointed as class counsel, and that Gordon Law Offices, chartered, be appointed as liaison counsel for the class.

IT IS FURTHER ORDERED, that counsel shall meet together and agree on the form of notice required under Rule 23(c)(2).